**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

December 8, 2017

**By Hand Delivery**
Honorable Kevin P. Castel
United States District Court
Southern District of New York
500 Pearl St., New York, NY

    Re:    United States of America v. Juan Thompson
           17 Cr. 5165 (PKC)

Dear Judge Castel:

    Juan Thompson, a first time offender, is profoundly remorseful for his crimes. He faces sentencing after having pled guilty to spreading a series of hoax threats and false information in an effort to embarrass and harass his ex-girlfriend, Francesca Rossi.

    This case has a remarkable background. Mr. Thompson is a young man who rose from a childhood of poverty and abuse in St. Louis to matriculating at Vassar College. At Vassar, his professors described him as "a brilliant writer,"[1] "role model and intellectual leader to many, a role he embraced."[2] Following college, Mr. Thompson became a journalist and initially had a successful career.

    Tragically, however, Mr. Thompson could not escape all of his childhood demons. He was plagued by a debilitating depression that he sought to anesthetize with alcohol. Eventually, he decompensated to the point where he committed the behavior that resulted in the crimes for which he is to be sentenced.

---

[1] Letter from Prof. Zachariah Mampilly, Exhibit A.

[2] *Id.*

Mr. Thompson's sentencing range is either 30-37 months or 37-46 months depending on the Court's resolution of a disputed sentencing enhancement with respect to whether the offenses were committed while Mr. Thompson was subject to a protective order. In light of Mr. Thompson's background and the circumstances that led to the commission of the offense, we urge Your Honor to impose a sentence at the bottom point of the applicable guideline range. We also request that intensive mental health and alcohol abuse treatment be conditions of his supervised release so that Mr. Thompson can address the issues underlying his conduct.

## STATEMENT OF FACTS

### *I. Childhood*

The conditions under which Juan Thompson grew up are sadly familiar, but his response to them represent a triumph rarely seen.

Juan is the oldest of ten children raised in St. Louis's troubled Fairground Park and Wells-Goodfellow neighborhoods. His father, Donald Jones, lived most of his adult life in prison and remained largely absent from his children's lives until he died in a car crash while fleeing from police.[3] Mr. Thompson's mother, Yolanda Thompson, was unemployed and drug addicted, and she struggled to provide for her children.[4] The large family usually lived in a two-bedroom apartment and were frequently evicted.[5] The children occasionally scattered among family members until Ms. Thompson could procure stable housing.[6]

Even when Ms. Thompson managed to provide a residence for her children, Mr. Thompson and his siblings regularly endured the horrors of drug use, violence, and criminality in and around their home.[7] Ms. Thompson left her drug paraphernalia in open

---

[3] PSR at p. 10-11, ¶¶ 65, 69.

[4] *See* PSR at p. 11, ¶ 67-68

[5] *Id.*

[6] *Id.*

[7] *Id.* at p. 10, ¶ 66.

view of her children.[8] Mr. Thompson often saw his uncles selling drugs out of their home and, on one occasion, he was present when the police raided that uncle's apartment.[9] As a young boy, he recalls occasions when he would watch officers burst into the apartment, yelling and screaming, guns drawn.[10] Mr. Thompson's mother and step-father often engaged in physical violence against each other, punching each other during substance-induced brawls.[11] Occasionally, Mr. Thompson's step-father would beat him with a belt or broom stick simply because he wet the bed.[12]

In the absence of stable adult guidance, Mr. Thompson took over as parent and caretaker for his younger siblings. His mother periodically went on crack binges in which she would disappear for days at a time.[13] Mr. Thompson was left to feed, clothe, and care for his siblings in her stead. He became "a positive role model"[14] in their lives, a little bit of normalcy in an abnormal setting.

Despite the violence and abuse that surrounded him, Juan was determined to live a different life. He did not want to be an addict or a pusher like the adults around him. He knew that education was the only way out of the struggle and sorrow all around him. Mr. Thompson became one of 250 desegregation students bussed from north St. Louis to Mehlville High School in a nearby suburb. Most of Mr. Thompson's classmates enrolled in the local community college or the University of Missouri-Columbia. According to his principal, Vince Viviano, Mr. Thompson was the only student accepted to Vassar College in Mr. Viviano's nine-year tenure at Mehlville.

## *II. Vassar College*

Vassar was a wholly different from any place a young Mr. Thompson had previously encountered. Nonetheless, Juan thrived there, but not without recognizing the race and

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *See id.* at p, 11, ¶ 70.

[12] *Id.*

[13] *Id.* at 10, ¶ 66.

[14] Letter from Saherra Thompson, Exhibit B.

class differences between his colleagues and the people in his home community. On his second day there, he told one of his professors that "landing at the elite campus of Vassar was a bit like landing on another planet, and he asked [the] white professor, how [she] understood diversity – somewhat testing [her], but also immediately striking [her] as genuinely curious and kind."[15] The two of them immediately formed a bond that lasted several years.[16] As an assistant at the Office of Religious and Spiritual Life, Mr. Thompson became "an important facilitator of community dialogues."[17] He helped facilitate "eye-opening"[18] conversations between white students and administrators about their experiences with people of color.[19] He worked to make the campus a more inclusive environment open to dialogue between people of all backgrounds.

Mr. Thompson also grew into "a prescient, extremely articulate student, a gifted writer, and a person who often helped [them] think through pressing issues."[20] He wrote for the school's newspaper and hosted a podcast with three other political science students. He also became a popular after-school tutor for middle and high school students in Poughkeepsie.[21] He also continued the leadership role he had begun with his siblings. During his time at Vassar, Mr. Thompson established lasting friendships with several of his professors. When Mr. Thompson left Vassar in 2013 to begin a career as a journalist, he did so with a great deal of promise, talent, and good will.

### III. Offense Conduct

Mr. Thompson, the son of an addict mother and a perpetually-imprisoned, drug dealing father, made it out of his gang-infested neighborhood through education, grit,

---

[15] Letter from Prof. Katherine Hite, Exhibit C, at 1.

[16] *See id.*

[17] *Id.* at 2; *see also* Letter from Rev. Samuel Speers, Exhibit D.

[18] Letter from Prof. Katherine Hite, Exhibit C, at 2.

[19] *Id.*

[20] *Id.* at 1.

[21] Letter from Prof. Katherine Hite, Exhibit C, at 1.

and self-discipline. But his socio-economic successes came at a cost to his psycho-emotional state.

Juan never truly broke free from the death, destitution, and despair that pervaded his formative years. Although he seemed to have successfully navigated the social and political norms of his new world, he failed to grapple with the remaining trauma that gnawed at his subconscious. Instead, he ignored the pain and depression, using alcohol to numb the feelings seeping to the surface.

In around 2015, Mr. Thompson became romantically involved with Francisca Rossi, a social worker for Housing and Services, Inc. In July of 2016, Ms. Rossi ended the relationship. During their relationship, Mr. Thompson was drinking heavily.

The breakup with Mr. Rossi ripped open emotions—rage, anger, sorrow, resentment—long repressed. To Mr. Thompson, in his alcohol besotted state, Mr. Rossi seemed to represent all that was wrong with society, and he made the terrible mistake of taking out his rage against her.

Over the next few months, Mr. Thompson employed the internet to do whatever he could to get revenge on Ms. Rossi. The abhorrent details of his offense are fully set forth in the Presentence Report. Some of Mr. Thompson's conduct involved making threats to various Jewish organizations and seeking to make them seem as if they came from Ms. Rossi. These threats had nothing to do with anti-Semitism. Rather, they were motivated solely by his disordered desire to cause distress to Ms. Rossi.

### *IV. Mental Health and Alcohol Abuse Issues*

Mr. Thompson has a long history of mental health problems. At the age of fourteen, he was prescribed Zoloft after suffering from multiple panic attacks caused by anxiety.[22] However, his treatment ended after only a few weeks.[23]

While in college, he engaged in monthly therapy sessions to address depression resulting from the trauma he experienced as a child, but he received no diagnosis or medication.[24] In 2015, he met with a therapist over the course of a few sessions, hoping

---

22

PSR at 12, ¶ 78.

23

*Id.*

24

*Id.* at 12, ¶ 79.

to treat his unresolved childhood issues. He received a depression diagnosis and was referred to an acupuncturist.[25]

Though he made minor efforts to get help, Mr. Thompson did not obtain the comprehensive mental health diagnosis and intensive treatment necessary to deal with his deep-seated emotional scars.[26] Rather, he began consuming inordinate amounts of alcohol to soothe his pain. As detailed in his Presentence Report, he drank alcohol from the moment he awoke in the morning until he fell asleep at night. He started with shots of liquor in his morning coffee, even drinking out of the bottle when showering.[27] He carried a flask throughout the day and ordered multiple glasses of wine at lunch.[28] Each evening, he drank up to an entire a bottle of wine or whiskey.[29] In the years preceding this offense, he slid into all-consuming alcoholism, largely ignoring his need for sustained dual treatment.

### V. Plea Agreement and Sentencing Guideline Calculations

On June 13, 2017, Mr. Thompson pleaded guilty to Cyberstalking (18 U.S.C. § 2261A(2)) and Conveying False Information and Hoaxes (18 U.S.C. § 1038(a)(1)). Mr. Thompson pled guilty pursuant to a plea agreement which calculated that he had a combined sentencing guideline range of either 30-37 months or 37-46 months based on a Criminal History Category of I and an Adjusted Offense Level of either 19 or 21.

The parties agreed to all of the guideline calculations except as to whether there should be an enhancement for Mr. Thompson's offenses involved the violation of a court protective order.

Pursuant to Mr. Thompson's plea agreement, the stipulated guideline range will differ if the Court finds that Mr. Thompson committed these offenses in violation of a court protective order.

---

[25] *Id.* at 12, ¶ 80.

[26] *See, generally,* Psychological Evaluation by Dr. Edward Fernandez, Exhibit E.

[27] PSR at p. 13, ¶ 83.

[28] *Id.*

[29] *Id.*

Hon. Judge Kevin P. Castel     <u>United States v. Juan Thompson</u>     December 6, 2017

United States District Court     **17 Cr. 165 (KPC)**     Page 7

Southern District of New York

The Probation Office agrees with the calculations stipulated to by the parties. The PSR calculates a guideline range of 37 to 46 months, assuming that the protection order enhancement applies. PSR, pars. 37 and 44.[30]

Paragraph 12 of the PSR notes that Ms. Rossi obtained a court protective order in August of 2016 and that the order of protection was renewed in October and December 2016. The PSR does not, however, contain any finding that Mr. Thompson was ever served with the order or appeared in court in connection with the order.

The Probation Office recommends a sentence at the bottom point of 37-46 month sentencing.

### VI. Post Arrest Conduct

Mr. Thompson's time in jail has forced him to sober up physically and mentally. He has returned to the Juan Thompson that his sister and professors write about in their letters to the Court.[31] Once again, he is the role model who impresses his colleagues with his intellect and work ethic. In his work evaluations at MDC, his supervisor rates him at the highest level in all categories, noting that

> His work ethic has made him a great fit for the position. He works quickly and efficiently, and gets the job done the right way. Mr. Thompson is always willing to lend a helping hand in other areas of the kitchen when he completes his objectives. . . . Thompson has shown intelligence and has set good examples for others.[32]



---

[30] PSR at p. 8-9, 19.

[31] Attached as exhibits to this letter.

[32] Work Evaluations, Exhibit F.

Hon. Judge Kevin P. Castel    United States v. Juan Thompson    December 6, 2017
United States District Court    17 Cr. 165 (KPC)    Page 8
Southern District of New York



## ARGUMENT

### A SENTENCE OF 30 MONTHS—THE LOW END OF THE CORRECTLY CALCULATED SENTENCING GUIDELINE RANGE—WILL APPROPRIATELY REFLECT BOTH THE SEVERITY OF THE HARM CAUSED TO THE VICTIM, THE MENTAL HEALTH ISSUES AND ALCOHOL ABUSE THAT CAUSED THE OFFENSE CONDUCT, AND MR. THOMPSON'S OTHERWISE ADMIRABLE AND SYMPATHETIC LIFE HISTORY

Juan Thompson is a talented man who, before and since his abhorrent criminal conduct, has demonstrated the ability to lead a good life. Based on the circumstances of the offense and his life history, we ask the Court to calculate the Sentencing Guideline range as 30-37 months and impose a sentence at the low end of that range. Such a punishment would best reflect the severity of the harm caused by Mr. Thompson's conduct while also taking into account Mr. Thompson's sympathetic personal history and the fact that his conduct was the product of mental illness and alcohol abuse.

At the outset, Mr. Thompson wants to make clear that he takes full responsibility for what he did. Regardless of his drinking or mental health issues, he knows what he did was wrong and he knew it at the time he was committing the crime. He accepts the fact that his misconduct merits punishment. Mr. Thompson is extremely remorseful for what he did. Ms. Rossi is a good person and did not in any way deserve the harm inflicted on her. Mr. Thompson wishes with all his heart that he could reverse time and do things differently.

It is equally clear to Mr. Thompson and to anyone else that at the point when he was threatening and harassing Ms. Ross, he was in desperate need of intensive mental health and alcohol abuse treatment, counseling and, perhaps, medication. He required these tools to deal with the deluge of emotion and rage he had so long repressed. If he had possessed the insight to recognize the intensity of his illness and taken the appropriate steps to deal with it, it is likely that his criminal conduct would not have taken place.

Mr. Thompson's personal history and his post-arrest conduct constitute significant mitigating factors. Title 18, U.S.C. § 3553(a) instructs a sentencing court to consider both the nature and circumstances of the offense and the history and characteristics of the defendant.

Mr. Thompson's life history is truly extraordinary. The jump from a dysfunctional family dwelling in the violent slums of St. Louis to becoming an admired student at Vassar College is one that very few individuals are capable of making. The letters from Mr. Thompson's college professors are a testament to his capacities and character.



In imposing sentence, the Court must also, of course, consider the applicable sentencing guideline range. The correct guideline range for Mr. Thompson should be 30-37 month because there is an insufficient factual basis for imposing the enhancement for committing the offense in violation of a protective order.

United States Sentencing Guideline §§ 2A6.1(b)(1) and 2A6.2(b)(3) provide for a 2 level enhancement if the offense "involved the violation of a court protection order." The PSR states that Ms. Rossi obtained an order of protection against Mr. Thompson in August of 2016 and renewed it in October and December of 2016. This allegation is not enough to apply the guideline enhancement.

An order of protection in New York State is not violated unless a person has knowledge of the order of protection and intentionally disobeyed it. Matter of McCormick v. Axelrod, 59 N.Y. 2d 574, 583 (1983); People v. Tumminello, 53 Misc. 3d 34 (Sup. Ct. App. Term 2016). Proof that defendant had knowledge may be established by proof of service or that the defendant was in court when the order was issued or that he or she signed the order. People v. Carthew, 19 Misc. 2d 138 (Sup. Ct. App. Term 2008). There is no evidence that Mr. Thompson was served with the order of protection or signed it or was in court when it was issued.

There do not seem to be any federal cases directly considering whether there must be sufficient evidence that a defendant had actual knowledge of a protective order before the sentencing guideline enhancement may be applied. However, Title 18, U.S.C. § 922(g)(8)(a) prohibits a person from possessing a firearm when subject to a court protective order. That statute, however, applies only to protective orders that were issued after "a hearing of which such person received actual notice, and at which such person had the opportunity to participate." Without such proof, a conviction may not be had even if an court order of protection, did, in fact exist. See United States v. Spruill, 292 F.3d 207 (5th Cir. 2002); United States v. James, 2015 WL 6848050 (M.D. Ala. 2015)(ex parte court protection order could not serve as basis for prosecution under Title 18, U.S.C. § 922(g)(8). These cases strongly suggest that in a sentencing context

there must be proof that a defendant had notice of a court protective order before his sentence may be enhanced for violating it.

In sum, given the § 3553(a) factors at play in this case, a sentence of 30 months, the low point of the correctly calculated range is sufficient to achieve the overarching purpose of sentencing. This is Mr. Thompson's first offense. His aberrant behavior stems from serious untreated mental health and alcohol addiction. Mr. Thompson's life story, achievements, perseverance, and his conduct during incarceration indicate that he is not prone to repeat his criminal behavior once he receives appropriate psychiatric and substance abuse treatment. Mr. Thompson still has great potential and a small network of people who are willing to support him through his time in prison, in treatment, and in greater society upon his release.[33] Accordingly, a 30 month prison term is adequate punishment.

## CONCLUSION

For the foregoing reasons, we respectfully urge Your Honor to impose a sentence of 30 months of imprisonment with special conditions of Supervised Release to include drug and alcohol abuse treatment and mental health counseling.

Respectfully Submitted,

/s/
Mark Gombiner
Jullian D. Harris
Assistant Federal Defenders

cc:   AUSA Jacob Warren (by Email)