HCK8THOS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              17 Cr. 165 (PKC)

5    JUAN THOMPSON,

6                   Defendant.

7    ------------------------------x

8                                      December 20, 2017
                                       11:00 a.m.
9
     Before:
10
                         HON. P. KEVIN CASTEL,
11
                                           District Judge
12
                             APPEARANCES
13
     JOON H. KIM
14        Acting United States Attorney for the
          Southern District of New York
15   JACOB E. WARREN
     JESSICA R. LONERGAN
16        Assistant United States Attorneys

17   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
18   MARK B. GOMBINER
     JULLIAN D. HARRIS

19

20

21

22

23

24

25

HCK8THOS

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MR. WARREN:  Good morning, your Honor.  Jacob Warren

5     and Jessica Lonergan for the United States.

6          THE COURT:  Good morning.

7          For the defendant.

8          MR. GOMBINER:  Mark Gombiner and Jullian Harris,

9     Federal Defenders, for Mr. Thompson.  Good morning, Judge.

10          THE COURT:  Good morning, Mr. Thompson.

11          Good morning, Mr. Gombiner and Ms. Harris.

12          The first order of business is I am going to go

13     through the materials I have, and the question, Mr. Gombiner,

14     will be whether I have everything I should have.  It will be

15     the same question for the government.

16          So I have a presentence report, recommendation and

17     addendum, prepared by probation and revised on September 1,

18     2017.  I have a letter from the government, dated December 13,

19     2017.  I have ten victim impact statements submitted by the

20     government on or about November 2, 2017.  I have a memorandum

21     submitted by federal defenders, Mr. Gombiner and Ms. Harris,

22     dated December 8, 2017.  That is what I have on the substance

23     of sentencing.

24          Do I have everything I should have, Mr. Gombiner?

25          MR. GOMBINER:  Yes, Judge.

HCK8THOS

1        THE COURT:  Same question for the government.

2        MR. WARREN:  Your Honor, I believe there's one

3   additional victim impact letter, dated November 10, 2017.

4        THE COURT:  All right.  I believe I reviewed it

5   upstairs, but do you happen to have a copy of it?

6        MR. WARREN:  Yes, your Honor.

7        THE COURT:  Let me know if you need it returned.  I

8   will give it back to you if it's your only copy.

9        Mr. Gombiner, have you seen this?

10        MR. GOMBINER:  Let me just take a look.

11        THE COURT:  Take a look.

12        Thank you.

13        All right.  Has the defendant read, reviewed and

14   discussed with you the presentence report, recommendation and

15   addendum?

16        MR. GOMBINER:  Yes, your Honor.

17        THE COURT:  Does the defendant have any objections to

18   the facts set forth in the PSR?

19        MR. GOMBINER:  To the facts, no, Judge.

20        THE COURT:  Any objections to the guideline

21   calculation?

22        MR. GOMBINER:  Yes, Judge.

23        THE COURT:  Why don't you go through that with me.

24        MR. GOMBINER:  Well, Judge, this was the one item in

25   the plea agreement that the parties agreed to disagree on,

HCK8THOS

1    which was whether the guideline enhancement for violating a

2    court order of protection applies.

3            THE COURT:  And your position is that order must be

4    served, and the government's position is that it need not be

5    served but the defendant must know of its issuance.

6            MR. GOMBINER:  Judge, my position is that under New

7    York law you have to have actual notice before you can be

8    guilty of violating a court order of protection.  I think the

9    law in New York is pretty clear that actual notice is not an

10   e-mail that you can construe or infer that the defendant may or

11   may not have, if there is some idea that there was some generic

12   order of protection.  Actual notice under New York

13   law -- generally, people get notice of a court order of

14   protection because they are served with it.  But New York

15   courts have also found that you could have notice if you are in

16   court when the order was issued, or there was one case where

17   the defendant was served in Vermont with a facsimile copy of

18   the order of protection and that wasn't service as defined

19   under New York law, but they had actual notice of it.

20           There is no case in New York, and the government

21   hasn't cited any, even remotely suggesting that the kind of

22   evidence the government is relying on, which is one e-mail in

23   which -- first, the government says it was sent by Mr.

24   Thompson.  The e-mail itself is not signed by him or anything.

25   But even assuming he did send it, the kind of reference to,

1    there is some kind of aggravated order of protection, you go

2    back to New York you would be arrested for violating it, it

3    doesn't even say order of protection in the thing, but that is

4    not what the New York courts mean by actual notice.  That's not

5    even constructive notice, which is a different kind of notice

6    and a lesser form.  New York courts require actual notice, and

7    there have been cases that have been dismissed on that basis

8    where there wasn't actual notice.

9          I would also point out that Mr. Thompson was in fact

10   interviewed by a New York City detective on November 22, 2016,

11   which was after --

12         THE COURT:  What date?

13         MR. GOMBINER:  November 22, which was after both the

14   initial order of protection and the renewed order of protection

15   had been issued, and that detective didn't tell Mr. Thompson

16   anything about there being any order of protection against him.

17         THE COURT:  So what?  He is investigating a crime.

18   Why would it be his job to say, And, sir, I want you to know

19   there is an order of protection against you.

20         MR. GOMBINER:  Because one of the things he said was,

21   I don't want you contacting Ms. Rossi.  That would seem to be

22   an appropriate circumstance under which you would say there is

23   an order of protection against you.  I am not saying that's

24   dispositive, but it's further evidence that Mr. Thompson did

25   not have actual notice, as defined by New York law, of this

HCK8THOS

1    order of protection, and therefore this enhancement should not

2    be applied.

3           THE COURT:  Let me hear from the government.

4           MR. WARREN:  Your Honor, I think on at least one

5    point, we are in agreement on the law in New York, which is

6    that for an order of protection actual notice is what matters,

7    and actual notice is what is required.  I don't think there is

8    any dispute that if there was actual notice the underlying

9    conduct would violate the order.

10          This is the reason we carved this issue out for your

11   Honor to decide in the plea agreement.  The government put its

12   best foot forward on these two pieces of evidence so as to

13   demonstrate actual notice, conceding that proper service of

14   process was not made here.

15          Those two pieces of evidence that show actual notice

16   are an e-mail from Mr. Thompson where he says in the e-mail

17   aggravated harassment.  He sent other e-mails like this,

18   basically making himself out to be the victim, and he seems to

19   acknowledge in the e-mail that there is this order of

20   protection in New York state, and he also makes the comment

21   about not traveling to New York.

22          The second piece of evidence is what we just

23   discussed, the interview with the New York City Police

24   Department detective, where Mr. Thompson told the detective

25   that they had filed harassment claims against each other.

HCK8THOS

1    Those are the two factual points that the government has to

2    demonstrate actual notice here, your Honor.

3            Again, I think on the law -- if there was actual

4    notice, I don't think that the defense and the government are

5    disputing that the order of protection would be violated.

6            THE COURT:  Mr. Gombiner, would the defendant like a

7    Fatico hearing on this issue?

8            MR. GOMBINER:  Judge, if it's going to affect the

9    Court's sentence -- let me just consult with my colleague.

10           THE COURT:  Yes.

11           MR. GOMBINER:  Judge, unless we are confident, which I

12   am not sure how we could be, that this wouldn't affect the

13   Court's sentence in any way, we would like a hearing on it.

14           THE COURT:  OK.

15           Government can proceed, if you'd like.  Do you want me

16   to set another date for this?  What's your pleasure?

17           MR. WARREN:  Your Honor, we would rest on the

18   underlying documents.  In a hearing we can proceed.  We

19   wouldn't call any witnesses.

20           THE COURT:  Do you have the documents?

21           MR. WARREN:  Yes, your Honor.  They are exhibits.

22   It's Exhibit B to the government's sentencing submission.

23           THE COURT:  Mr. Gombiner, you have seen Exhibit B?

24           MR. GOMBINER:  Exhibit B?  Just one second, Judge.

25           Yes, I have seen all of these things.  I am just

HCK8THOS

1    trying to locate them.

2              THE COURT:  Take your time.

3              MR. WARREN:  Just for the record, I have handed up

4    Exhibits B and C to the government's sentencing submission.

5              THE COURT:  I now see Exhibit C has been handed up.

6              MR. WARREN:  The underlying e-mail that I was just

7    speaking about, if I could just have a minute to find that

8    document, your Honor.

9              THE COURT:  Yes.

10             MR. WARREN:  I am also handing up Exhibit E to the

11   Court, which is the e-mail that I mentioned.

12             THE COURT:  All right.  Any objection to these three

13   exhibits, Mr. Gombiner?

14             MR. GOMBINER:  No.  We don't have any objection to

15   their authenticity.

16             THE COURT:  So they are received.

17             (Government's Exhibits B, C & E received in evidence)

18             THE COURT:  Anything further from the government?

19             MR. WARREN:  Nothing further from the government on

20   this point.

21             THE COURT:  Mr. Gombiner, do you have any evidence you

22   want to offer?

23             MR. GOMBINER:  We don't have any evidence.

24             THE COURT:  So the defense rests?

25             MR. GOMBINER:  Yes, Judge.

HCK8THOS

1          THE COURT:  Let me hear from the government.  Walk me

2    through what you rely on from the detective and what you rely

3    on from the e-mails.

4          MR. WARREN:  Yes, your Honor.  This is, of course, my

5    mistake.  That's the only copy I brought of those exhibits.

6          THE COURT:  I will lend them back to you, but go

7    ahead.

8          MR. WARREN:  Thank you, your Honor.

9          So, your Honor, Exhibit B is the order itself, which I

10   don't think that's in dispute at all.

11         Exhibit C is the detective's report.  And in the

12   detective's report there is --

13         THE COURT:  Detective Rivera?

14         MR. WARREN:  Yes, your Honor.  And this is on page,

15   the Bates stamp is USAO 360.  And this is on the third numbered

16   paragraph on that page of the detective's report of his

17   interview with Mr. Thompson:  "I asked Mr. Thompson if he has

18   been in contact with the victim.  He stated not since leaving

19   NY.  He states they filed reports against each other for

20   harassment, but states that he does not engage in communication

21   with her."

22         That's the first point on this detective's summary of

23   that interview; the inference being that Mr. Thompson knew that

24   there was an order of harassment that had been filed.

25         THE COURT:  He knew there was a proceeding.

HCK8THOS

| 1 | MR. WARREN:  Yes, your Honor.

| 2 | THE COURT:  He knew there was a proceeding commenced,

| 3 | maybe not the outcome based on that, but he knew there was a

| 4 | proceeding is the most I would infer from that.

| 5 | Go ahead.

| 6 | MR. WARREN:  Then Exhibit E, your Honor, is an e-mail,

| 7 | and the top e-mail in this chain, this is the second

| 8 | page -- sorry, this is the first page of Exhibit E behind the

| 9 | actual exhibit.  And the top e-mail is from Mr. Thompson.  It

| 10 | says, "The hacker or hackers tweeted at my sister who told me

| 11 | about it.  I then looked at the timeline, noticed they were

| 12 | engaged with someone who was very familiar with me, my friend

| 13 | below, that engaged that account, and this is what happened."

| 14 | THE COURT:  That's the end of the quote?

| 15 | MR. WARREN:  That is the end.

| 16 | THE COURT:  Let's have a clear record here.  If you're

| 17 | starting a quote, tell me when you're starting it; if you are

| 18 | ending it, tell me when you're ending it.

| 19 | Go ahead.

| 20 | MR. WARREN:  There is then a forwarded message.  The

| 21 | forward is from veronicareeves6@gmail.com, on September 29,

| 22 | 2016, at 7:14 p.m.  And it's to thompsonotherkin@gmail, Mr.

| 23 | Thompson's Gmail address.

| 24 | This is a quote from the message that's forwarded:

| 25 | "OK, Juan.  You're a coward.  I'm the guy who lives and loves,

HCK8THOS

1    Juan.  Obviously you get your female bullying tactics from your

2    father.  Researching you has been quite a laugh."

3              THE COURT:  Slow down.  We have a court reporter who

4    is trying very hard to take this all down.

5              MR. WARREN:  Understood.

6              "You're a character.  So how about this?  You never

7    contact, disparage, remark, e-mail, threaten, try to contact

8    her again, at her work, home, through friends or relatives,

9    using electronic means, phone (cell or landline), e-mail, text

10   or in person, through your friends, relatives, or other

11   persons, true or fake.  If you comply, it will end here, except

12   if you show up in the State of New York, whereas a warrant has

13   been issued for your arrest for violation of an order of

14   protection (aggravated harassment by electronic means).  It's

15   just another day at the office for me, Juan.  This whole thing

16   lies in your hands.  Your future, Juan."

17             THE COURT:  And this is from?

18             MR. WARREN:  This is from an e-mail account that Mr.

19   Thompson created and then sent to himself.  That's the

20   September 29, 2016, at 7:14 e-mail.

21             THE COURT:  So it's an e-mail from Mr. Thompson to Mr.

22   Thompson.

23             MR. WARREN:  Yes, your Honor.

24             THE COURT:  Hand it up, please.

25             MR. WARREN:  I am handing up Exhibit E to the Court.

HCK8THOS

1          THE COURT:  I want the other exhibits back also.  They

2     have been received into evidence.

3          MR. WARREN:  I am also handing up Exhibit C and

4     Exhibit B.

5          THE COURT:  Thank you.

6          Mr. Gombiner, anything else?

7          MR. GOMBINER:  Well, Judge, first, with respect to

8     this e-mail, that's the government's theory as to who sent this

9     e-mail to whom.  There is no evidence to support that other

10    than the government's statement.  This isn't an e-mail from Mr.

11    Thompson.  The government wants the Court to infer that he made

12    this up and created it, but there is no evidence of that.  So

13    we would object to it on that basis.

14         But even if the government could prove that, the

15    statement that "whereas a warrant has been issued --"

16         THE COURT:  Wait a minute.  You deny that from Juan

17    Thompson at thompsonotherkin@gmail is not your client's --

18         MR. GOMBINER:  No, I am not denying that.  I am

19    denying the e-mail in question is from veronicareeves6@gmail.

20         THE COURT:  This is the problem you have, Mr.

21    Gombiner.  The government says this was an e-mail that Mr.

22    Thompson wrote and sent it to Mr. Thompson.  But if we

23    generously assume that that's not true, that he didn't send it,

24    that he didn't write it, if we generously assume that, still we

25    have Mr. Thompson receiving the e-mail, which puts him on

HCK8THOS

1    notice of the order of protection.

2            MR. GOMBINER:  Judge, I would say that is well beyond

3    anything that could be reasonably taken away from this e-mail,

4    whether Mr. Thompson received it or whether he wrote it

5    himself.  Because the only relevant portion of it says,

6    "Whereas a warrant has been issued for your arrest for

7    violation of an order," that is not true.

8            THE COURT:  Read what it says.  That's not what it

9    says.

10           MR. GOMBINER:  "Whereas a warrant has been issued --"

11           THE COURT:  Excuse me a second, Mr. Gombiner.  Don't

12   interrupt me.  That's not what it says.  Please read what it

13   says.

14           MR. GOMBINER:  "Except if you show up" -- I am reading

15   the relevant portion of it.  I can read the whole thing.

16           THE COURT:  What you specifically did in terms of the

17   relevant portion, you omitted the words "of protection."  That

18   strikes me as rather relevant.

19           MR. GOMBINER:  Judge, OK.  Let me just read it over

20   again.

21           The relevant portion reads:  "Except if you show up in

22   the State of New York, whereas a warrant has been issued for

23   your arrest for violation of an order of protection (aggravated

24   harassment by electronic means)."

25           I can keep reading.  "It's just another day at the

HCK8THOS

1   office for me, Juan.  This whole things lies in your hands.

2   Your future, Juan."

3            So the points I was trying to make is, one, there was

4   no warrant that had been issued for his arrest.  In fact, the

5   New York City detective who came two months later didn't have a

6   warrant for Mr. Thompson's arrest.  So that is simply not

7   accurate.

8            "An order of protection (aggravated harassment by

9   electronic means)," that does not show knowledge of the

10  specific order of protection that was issued.  The order of

11  protection issued against Mr. Thompson was not simply an order

12  of protection about aggravated -- I am not even sure what that

13  means, "aggravated harassment by electronic means," but this

14  does not suffice to show that Mr. Thompson had actual notice

15  that an order of protection had been given.

16           There is no case in New York law, I am 100 percent

17  confident, that anything remotely close to this has ever been

18  held to constitute actual notice.  The idea that maybe somebody

19  had obtained some kind of an order is not enough to prove --

20  even if you could infer that from this, and I would suggest

21  that you can't, but even if you could, that wouldn't be enough

22  to prove you had actual notice of the specific order at issue.

23  There is no crime in New York for just violating an order of

24  protection in general; you have to violate a specific order of

25  protection.

HCK8THOS

1    THE COURT:  But the guideline does not require that

2    there be a finding by any court in the State of New York that

3    you violated an order of protection.

4    MR. GOMBINER:  The guideline does require it.  The

5    guideline requires that you have violated an order of

6    protection.

7    THE COURT:  Listen to what I said.  The guideline does

8    not require that any New York court have found that you

9    violated an order of protection.  You disagree with that

10   statement?

11   MR. GOMBINER:  I certainly don't disagree with it, in

12   that the guideline doesn't have New York in it.  But the

13   guideline does say that it applies to someone who has violated

14   an order of protection.

15   THE COURT:  Correct.

16   MR. GOMBINER:  The only order of protection we have

17   here is a New York court order of protection.  So to have

18   violated a New York court order of protection, you would have

19   had to do something that constituted a violation of a New York

20   order of protection.  And in New York you haven't violated an

21   order of protection unless you have first received actual

22   notice of it.  So that is why it is important what New York

23   courts have construed actual notice to be.

24   THE COURT:  Where is your case law?  The government

25   has come forward and has cited *McCormick v. Axelrod* and *People*

HCK8THOS

*v. Jakubowski.*  Where is the case law that you have to have the

actual order?  Do you have any such case?

          MR. GOMBINER:  I do have some cases.  The cases that

we cited -- *McCormick*, *Tumminello*, *People v. Carthew* -- they

are in our letter.  But in other cases, those are cases where,

when there was actual notice, actual notice was either being in

the court when the order was issued or having received a

facsimile copy in another state, or maybe your lawyer was given

a copy of the order.  It's something where you could find that

the defendant actually knew what the specific order against him

was.  There is no case, for example, where a neighbor said,

Hey, Joe, I heard that your wife got an order of protection

against you, and a court found that something like that was

actual notice.

          That's basically what the government has got here.

That is just not enough.  New York courts, whether for good or

for bad, take the concept of actual notice seriously.  They

don't mean it's just any rumor that there is an order of

protection out there.  They mean there is something specific

where the court can find that the defendant knew about the

particular order of protection that a particular court had

issued against him or her.  And this doesn't suffice.  So we

don't think that this is good enough to constitute actual

notice.

          THE COURT:  Thank you.

HCK8THOS

1    I find by a preponderance of the evidence that Juan

2  Thompson knew of the existence of an order of protection issued

3  by a New York court and thereafter violated the order of

4  protection; and, accordingly, the enhancement under 2A6.1(b)(3)

5  is appropriate.

6    I begin with the telephone interview of Mr. Thompson

7  on November 3, 2016 by a New York City police detective by the

8  name of Rivera, part of the special investigations division, in

9  which he asked if Mr. Thompson had been in contact with the

10 victim and he stated, "Not since leaving New York.  He states

11 that they filed reports against each other for harassment, but

12 states he does not engage in communication with her."  This

13 reflects knowledge on his part of judicial proceedings in New

14 York; that's a reasonable inference to be drawn from the

15 exhibit.  It does not, however, reference an order of

16 protection.

17    There is, in addition to that, the September 29, 2016

18 e-mail from Veronica Reeves to Juan Thompson.  While the

19 government contends that Mr. Thompson was the author and the

20 recipient of the e-mail of September 29, 2016, there is no

21 serious dispute that he at least received the e-mail.

22    The government's theory of the case is that this was

23 an attempt again to build a false record, but, nevertheless, it

24 was received by Mr. Thompson and it says, "Except if you show

25 up in the State of New York."  It says -- I will back it up.

HCK8THOS

1   It says, in essence, that "you never contact, disparage,

2   remark, e-mail, threaten, try to contact her again, at her

3   work, home, through friends or relatives, using electronic

4   means, phone (cell or landline), e-mail, text or in person,

5   through your friends, relatives or other persons to her face.

6   If you comply, it will end here."  This is the relevant

7   language that proceeds after that:  "Except if you show up in

8   the State of New York, whereas a warrant has been issued for

9   your arrest for violation of an order of protection (aggravated

10  harassment by electronic means)."  And then it says, "It's just

11  another day at the office for me, Juan.  The whole thing lies

12  in your hands.  Your future, Juan."

13          I find by a preponderance of the evidence that Mr.

14  Thompson was on notice of the issuance of an order of

15  protection by the New York courts at least as of September 29,

16  2016.  And to the extent he didn't know the words of the order,

17  that would simply be because of conscious avoidance, which is

18  the equivalence of knowledge.  When one consciously avoids

19  learning facts, the consequence of said avoidance is the same

20  as if one has actual notice knowledge.

21          So that's my finding.  I find the enhancement is

22  appropriate.

23          Any other objections to the guideline calculation, Mr.

24  Gombiner?

25          MR. GOMBINER:  No, Judge.  Just to complete any

HCK8THOS

1    record --

2         THE COURT:  Wait a minute.  I gave you a full and fair

3    opportunity to say anything else you have to say.  If you want

4    to disagree with my ruling, there is place you can go for the

5    disagreement.  I asked you if you had any other evidence, you

6    wanted to make any other argument.  If your purpose now is to

7    make a comment on my ruling, the time has come and passed for

8    that.

9         MR. GOMBINER:  The only comment I was going to make

10   was --

11        THE COURT:  Is it about the ruling?

12        MR. GOMBINER:  -- addressed to an issue that the

13   government did not raise.  Nobody had suggested before the idea

14   of conscious avoidance is a way you can violate an order of

15   protection.

16        THE COURT:  Well, that's great.  Why don't you take

17   that up on appeal.  That's an alternate finding I made.  It's

18   clear you disagree with the finding.  I don't ask you to agree

19   with it, but we have now been on this issue for quite some time

20   and we have other business to attend to.

21        MR. GOMBINER:  Thank you, Judge.

22        THE COURT:  Do you have any other objections to the

23   guideline calculation in this case?

24        MR. GOMBINER:  No, we don't.

25        THE COURT:  Does the government have any objections to

HCK8THOS

1    the guideline calculation in this case?

2              MR. WARREN:  No, your Honor.

3              THE COURT:  I find that the guidelines are correctly

4    calculated and the defendant is at total offense level 21,

5    Criminal History Category I, and the proper guideline range of

6    imprisonment is 37 to 46 months' imprisonment.

7              I will now give Mr. Gombiner an opportunity to speak

8    on behalf of the defendant.

9              MR. GOMBINER:  Thank you, Judge.

10             The major point I would like to make here is that Mr.

11   Thompson is extremely remorseful for what he did here.  What he

12   did here was horrible, and he knows it.  He knows what he did

13   caused extreme pain, not only to Ms. Rossi, most of all to her,

14   but also to her coworkers, to her family, and to the people who

15   ran the Jewish community centers.  There is no excuse for his

16   conduct.  He accepts responsibility for it.  He pled guilty to

17   it and he knows that he has to be punished for it.  So I just

18   want to make that absolutely clear at the outset.  Nobody is

19   trying to justify what he did or say that there was anything

20   good about it.  It obviously had a very bad, not surprisingly,

21   bad impact on the people who were the victims of his conduct.

22   We accept that.

23             The Court has found that the guideline range is 37 to

24   46 months.  The government in its sentencing letter says a

25   sentence within that guideline range would constitute a just

HCK8THOS

punishment.  We thought a lower guideline range should apply,
but in our sentencing letter we also asked for a sentence
within the guideline range, although at the low end of it.

So, really, the question for the Court is not, does
Juan Thompson deserve to be punished, because obviously he
does.  The question is, what degree of punishment is warranted?
And there are two principal factors I would ask the Court to
look at in determining what an appropriate sentence is.  The
first is what led Juan Thompson to commit this conduct.  Maybe
there are three things.  First, why did he do this?  Who is
Juan Thompson?  And going forward, what is his future going to
be?

Why did he do this?  I think it was a combination of
mental illness and alcohol abuse, and maybe, with an overlay of
just generally dealing with the trauma and the very difficult
upbringing he came from, trying to resolve that with how far he
had gotten from that point, and obviously something happened
here that he couldn't -- not that he couldn't resolve it, but
that led him to do what he did.

Mr. Thompson had a very difficult childhood, and from
a very early age has had some problems with mental illness.  At
the age of 14, he was being prescribed medication.  He was
having panic attacks.  He sought mental health treatment while
in college and after college.  So he has definitely had some
history of mental illness.  We submitted a psychological

report, I forget the doctor's name.

THE COURT:  Yes, I have read it.  Dr. Rodriguez, is it?

MR. GOMBINER:  Fernandez.

THE COURT:  Thank you.

MR. GOMBINER:  Who does find that -- he did find that Mr. Thompson does have a history of mental illness.  He doesn't think that Mr. Thompson is, like, critically mentally ill, but -- obviously, he is not schizophrenic or anything like that.  So there are degrees of mental illness, obviously, but that he does have some serious mental health problems.

The other, I think, precipitating factor for this, and probably the more direct factor, is the very serious issue of alcohol abuse, which, unfortunately, Mr. Thompson didn't really recognize in himself, because I think he saw alcohol as kind of a way of getting in touch with his emotions, but he was drinking very excessively during the time this conduct was going on, and I think that certainly contributed to the kind of things he was doing.

I think Dr. Fernandez found that that combination leads to impulsive -- impulsive not in the sense -- obviously, these things took a certain degree of thought and planning in one sense, but impulsive in the sense that he wasn't really fully in control of thinking, like, what does this mean to be doing this kind of stuff?  So I think that contributed to it.

HCK8THOS

1          Now, there is no question that Mr. Thompson is a very

2     unusual individual.  There aren't too many people who grow up

3     in the slums of St. Louis who end up getting admitted to Vassar

4     College.  But not just getting admitted.  We submitted a number

5     of letters from his professors there, and it's clear that Mr.

6     Thompson was an excellent and admired student.  He did many

7     things.  He was a good student.  He was a leader.  He

8     contributed to the community.  The kind of letters we

9     submitted, these weren't just stock letters, these were letters

10    that detailed many of his accomplishments, and that is a

11    somewhat remarkable thing.

12         So Mr. Thompson definitely has some strengths; not

13    just strengths but -- unique would not be the right word,

14    because that would be one of a kind, and I am not suggesting

15    Mr. Thompson is one of a kind, but he certainly is in a very

16    small percentage of people who are able to come from a

17    background of poverty and abuse and neglect and succeed at a

18    very elite, privileged institution like Vassar College.  So I

19    think that is something that is worthy of the Court's

20    consideration.

21         I also think it's worthy of the Court's consideration

22    at a completely different level.  Since he has been in prison,

23    Mr. Thompson has been working at the food service unit at the

24    Metropolitan Detention Center, and he is getting very good

25    reviews there.  He has been a hard worker.  The people who are

1    supervising like him.  So he is clearly able to shift gears and

2    do well in that kind of an environment as well.  So he does

3    have some definite strengths.

4           So I think those are factors the Court should take

5    into consideration.  Probably the ultimate issue I think here

6    is, well, what is going to happen in the future?  Because,

7    obviously, the Court would and probably should have concerns

8    over, well, is Mr. Thompson going to be doing something like

9    this again?  Does he pose a danger to the community once he

10   gets out?  And I don't want to say there is no risk, because

11   that would be disingenuous, but what I think could work here

12   and will work here is -- I think definitely a degree of

13   punishment is warranted.  I am not putting that aside.  This

14   isn't just about Mr. Thompson because there are victims here as

15   well.

16          So I think a guideline sentence probably is warranted

17   here, but I think it needs to be followed by -- once he gets

18   out, there definitely needs to be conditions of supervised

19   release that require intensive both mental health treatment and

20   substance abuse treatment.  And that's what Dr. Fernandez

21   recommended.  He thought that would go a long way towards

22   mitigating any future risk.

23          This is a case, I think Mr. Thompson is the kind of

24   person that, if he is able to deal with those issues, he really

25   can be a successful person in the world.  He definitely has the

HCK8THOS

1    capacity to do things that very few defendants who appear

2    before the Court have those kinds of abilities.  We just don't

3    see that very often, and putting aside state court, you don't

4    see it very often in federal court either, even with people who

5    maybe have had a lot more opportunities earlier on in life.

6            Mr. Thompson has managed to achieve a great deal.  He

7    has also done harm here, and I understand that's why we are

8    here.  This is not trying to get him a reward or anything.  But

9    I do want to make clear that he is somebody who can, going

10   forward, do something really positive with his life.  All he

11   can say now about what happened is that he is tremendously

12   ashamed and remorseful for what he did.  I mean, he knows the

13   harm and pain it caused people and he is in jail right now,

14   sitting here chained at his ankles.  This has already been a

15   hard situation for him, and it's going to continue to be hard

16   for a while, but I think it sends -- the Court now has found

17   that the guideline range is 37 to 46 months, so accepting -- we

18   have objected so I will move on from that, but accepting that

19   as the range, we think a sentence at the low end of the

20   guideline range would be an appropriate balance of all the

21   factors under Section 3553(a), and we would ask the Court to

22   impose such a sentence.

23           THE COURT:  Thank you, Mr. Gombiner.

24           MR. GOMBINER:  Can we approach the sidebar just for

25   one minute with the government?

HCK8THOS

1              SPECTATOR:  May I object?

2              THE COURT:  You may object.  Let me find out what it

3       is and then I will decide the appropriate way to go.

4              (Continued on next page)

5              (Pages 27-30 sealed by order of the court)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCK8THOS

1          (In open court)

2          THE COURT:  Ladies and gentlemen, the sidebar, which I

3    think about 50 percent of it related to what I would now say

4    and the other 50 percent is what information I got, related to

5    an ongoing investigation and Mr. Thompson's role in possibly

6    being able to assist or having assisted in some aspect of that.

7    And the nature of that circumstance is far removed from the

8    conduct in issue in this case factually, and I need not say

9    anything further, and I have ordered that portion of the

10   transcript sealed.

11         Mr. Thompson, this is your opportunity to speak, to

12   address the Court directly, to bring to my attention any facts

13   or circumstances that you believe I should take account of in

14   passing sentence upon you today.  If there is anything you wish

15   to say, this is the time to say it.

16         THE DEFENDANT:  May I stand?

17         THE COURT:  You may stand.

18         THE DEFENDANT:  I just wish to say that I wish my

19   family were here.  Also, part of me doesn't wish that they were

20   here.  I came from working-class people and the holidays are

21   around the corner and my 17-year-old sister is starting

22   college.  I wouldn't dare ask that any of them, given all I

23   have asked of them so far.  Even though they are not here in

24   the physical realm, I know they are here in the spiritual and

25   send their love, and for that I am grateful.

1          I also wish to apologize to Ms. Rossi.  I know the

2     pain and the embarrassment that she suffered is the result of

3     my decisions, the actions that I have made.

4          Being incarcerated in this entire experience has

5     taught me there are some unpleasant truths about myself that I

6     haven't come to grips with yet, and that I have to an extent

7     now that I have been incarcerated.  And given the scope of

8     things and what is happening around the country, I know there

9     are still strands of misogyny and bigotry within me that I am

10    committed to battling and to licking once and for all.

11         I also wish to apologize to the Jewish community

12    centers for the suffering that they have experienced.  To know

13    that people who I admired and respected for their resilience

14    have been hurt by my own decisions and choices has been

15    heartbreaking on multiple fronts.  There are wounds that are

16    there that will probably never heal.  Not only did I not heal

17    those wounds or help them, I added salt to those wounds and

18    made it worse.  Ultimately, to all those who were harmed by my

19    choices, by the things that I did, I offer my heartfelt

20    apologies.  I do not seek absolution, but I do seek

21    forgiveness.

22         The only promise that I can make to this Court is that

23    such a hideous thing on my part will never happen again.  I do

24    realize that it's important to take care of one's mental

25    health.  I do realize how important knowledge and consciousness

1    is and you have to take everything that happens as a slight or

2    micro-aggression or anything along those lines.  If I am truly

3    committed to the idea of a more humane society, then it starts

4    with me, and I screwed up royally in this instance and I

5    apologize deeply.

6              THE COURT:  Thank you, Mr. Thompson.

7              This is the government's opportunity to speak.

8              MR. WARREN:  First, I would just like to note that Ms.

9    Rossi is here, and she has a lot of friends and family here to

10   support her.  She would like to address the Court, and I know

11   we have been going on for a long time, but I think she has

12   about ten minutes worth of prepared remarks that she would like

13   to address to the Court.

14             The conduct here is just devastating.  If you read the

15   victim impact statements, it's awful, it's horrific.  What she

16   went through is terrible.  She is an incredibly strong person

17   to have endured it; not only everything that happened was bad,

18   to have the tables turned against her so that she was the one

19   being investigated by law enforcement through these false

20   claims.  It wasn't just her, it was her friends, her family

21   members, her employer, who suffered through this.

22             The victim impact letters, the ones from her parents,

23   there is no worse feeling than seeing your child suffer and

24   knowing there is nothing you can do about it.  Someone

25   described it as, watching Ms. Rossi go through it and going

1     through it themselves is a living nightmare.  As Ms. Rossi said

2     in her letter to the Court, she lost a year of her life over

3     this.  And it wasn't just Ms. Rossi and her friends and her

4     family members and her employer, it was her entire community

5     also, the victim organizations.

6            While there is no evidence in the record that Mr.

7     Thompson ever planned on or took any steps to carry out these

8     threats, they all have to act, when they receive a bomb threat

9     like this, as if it would be carried out.  So dogs have to be

10    called in, first-responder resources have to be diverted there.

11    And as pointed out in the government's sentencing submission,

12    those organizations effectively shut down for a period of time

13    until the threat is neutralized.  And when these threats were

14    made, there was, of course, this atmosphere of fear, these

15    threats all across the country, and the defendant's conduct

16    here perpetuated that.

17           So for those reasons, the reasons in the victim impact

18    letters, the reasons in the government's sentencing submission,

19    we do think a guideline sentence of incarceration is

20    appropriate here, and we also recommend a period of supervised

21    release and special conditions that the probation department

22    recommended.

23           THE COURT:  Thank you.

24           Ms. Rossi, you may come forward, if you'd like, and if

25    it would be convenient, you may stand at the podium.

1                    State your full name.

2                    MS. ROSSI:  Francesca Rossi.

3                    THE COURT:  That's R-O-S-S-I?

4                    MS. ROSSI:  Yes.

5                    THE COURT:  Please proceed.

6                    MS. ROSSI:  Thank you, your Honor.

7             I stand in front of you today grateful to be alive.

8    Men like Juan Thompson usually end up murdering their victims.

9    He stalked, harassed and threatened me with such insidious

10   methods, I feared for my life every day.  Despite being present

11   today at sentencing, I am still not convinced that he won't try

12   to kill me.

13            We are here today because Juan Thompson threatened 12

14   Jewish community centers, in my name, as a part of his abusive

15   tactics aimed at destroying my life.  We are here because

16   domestic terrorism is rooted in violence against women.

17            Now think to yourself, how many times during the day

18   does your phone vibrate, with an alert about an e-mail, a text,

19   a post, a status update, a phone call?  Imagine each time you

20   receive these alerts your mind goes blank, your body becomes

21   paralyzed in fear and you can't breathe, because each of these

22   alerts is caused by a person threatening to harm you and

23   everyone that you know.

24            When I met Juan Thompson, I thought I had met the

25   perfect man.  He was charming, intelligent, handsome -- he was

1    a passionate journalist who said he could change the world

2    through his words.  He said all the right things.  We fell in

3    love over dinners and deep conversations about social justice.

4         After a year together, things started to fall apart

5    and the real Juan emerged.  He was accused of plagiarism and

6    falsifying sources by his employer and was immediately fired.

7    His public persona and career were ruined in an instant.  I

8    assumed the role of supportive partner and stood by his side,

9    believing his cover story and dismissing the accusations of

10    fraud.  He had an excuse for everything, and I believed him.

11         Still, a seed of doubt began to grow in my mind.

12    Although the media coverage of my story has reported that

13    Juan's abuse began when I ended our partnership, the reality is

14    that Juan was actively abusing me while we were in a

15    relationship and living together.  His pattern of impersonating

16    sources and defrauding people wasn't limited to his work.  He

17    spent the entirety of our relationship using those same tactics

18    to isolate, shame and abuse me.

19         Juan's campaign was methodical and extensive.  While

20    we were living together, I spent months believing that

21    ex-boyfriends were stalking and threatening me.  I received an

22    onslaught of e-mails, phone calls and texts with horrible false

23    accusations about me.  A nude picture of me was found on

24    Facebook, posted by an impersonated ex-boyfriend's profile

25    picture.  I received a lawsuit, supposedly filed by an ex's

wife, falsely alleging that I had spread an STI to her husband
and therefore to her.  I didn't know --

THE COURT:  STI?

MS. ROSSI:  Sexually transmitted infection.

I didn't know it was fake until we found that the
lawyer who had purportedly filed it had been impersonated.
During this time, I sought support from Juan, unaware that he
was directing and inflicting the emotional turmoil I was
experiencing.  He constantly compared himself to these men and
harped on their supposed transgressions.  I started to feel
paranoid, not understanding why so many of my exes were
stalking me and trying to hurt me.

When I retained a lawyer to pursue a case against the
ex-boyfriend, who had supposedly posted revenge porn, she asked
me a sobering question:  Are you certain this wasn't actually
done by your current boyfriend?  I was shocked at the
possibility, and to learn that New York State does not have a
revenge porn law.  You'd be surprised, she explained, the
majority of people who experience this type of manipulation are
actually being stalked by their current partner.

She was right.  The man I trusted and shared my home
with was actively trying to destroy me.  It's hard to explain
how I felt when I realized that all of the harassment I had
endured was actually perpetrated by the man that I was in love
with.  My prior months of torment flashed before me as I

HCK8THOS

1   realized that Juan was behind all of it, receiving vicarious

2   pleasure through my psychological pain.

3          THE COURT:  Approximately when did you come to that

4   realization?

5          MS. ROSSI:  In July of 2016.

6          THE COURT:  Thank you.

7          MS. ROSSI:  I felt like my insides were being ripped

8   apart as my mind shut down from its attempts to process the

9   horrific reality.

10          I had no idea this was the beginning of the nightmare.

11   The shock never really wore off, but the terror set in.  And I

12   have lived in fear for my life every day since.

13          I ended my relationship with Juan as soon as my lawyer

14   confirmed he had authored the fake lawsuit.  He refused to

15   believe it was over and would not leave my apartment.  I wanted

16   him out of my life and I believed that breaking up would end

17   this torment.  Juan only escalated.

18          Every day for the next nine months, the life I had

19   loved and had worked so hard to build became unrecognizable.

20   My joy and my passion was taken from me.  I felt no emotion

21   other than fear and dread about what would happen next.

22          Juan went after me where he thought he would hurt me

23   the most.  I have dedicated 15 years of my life to my career as

24   a social worker.  I work with vulnerable clients and they trust

25   me with their lives.  I am passionate about the work I do with

1   and for them.  Juan knew this.  When he lost direct access to

2   me, he began to attack me in my professional world.

3           The day after I broke up with Juan, he tried to get me

4   fired.  He repeatedly contacted my agency's senior management

5   team while posing as multiple journalists and claimed to be

6   investigating me for various professional and ethical

7   infractions.  He said I had been pulled over for drunk driving;

8   he said I was being investigated for spreading an STI to

9   numerous partners; he said I bought drugs from my clients --

10  all of which I could have been fired for, none of which were

11  true.  Because I had already informed my employer of the

12  situation, they were on alert for suspicious e-mails and phones

13  calls.  They refused to engage with Juan's fake personas, which

14  only further antagonized him.

15          He began harassing my supervisors, our board of

16  directors, my coworkers and employees for the next nine months.

17  Through the personas he invented, he attempted to extort tens

18  of thousands of dollars from the agency.  He sent pictures of

19  guns to human resources alleging that they were mine, and that

20  I was the one threatening him.  He accused me of being

21  anti-Semitic and racist.  He sent faxes, e-mails, postings,

22  made-up articles, and phone calls in attempts to get me to lose

23  my job.  And it didn't stop there.  Juan made similar

24  accusations to the professional social work board I am licensed

25  under.  It resulted in an investigation which could have

1  jeopardized my entire career.

2          On top of managing the intensity of my workload, I had

3  to learn how to cope with receiving threatening e-mails in my

4  work inbox all day, every day.  In between stabilizing my

5  clients' emotional crises, I struggled to keep from drowning

6  myself, as I received e-mails from Juan with pictures of me,

7  allegedly linked to sex tapes he threatened to expose, which

8  made me fear he had secretly recorded me.  While sitting at my

9  desk, I would receive e-mails with subject lines, such as "this

10  bullet's for you slut," or, "your life will be destroyed."  He

11  sent me my family's home addresses and told me they were next.

12  When my boss would call me, I didn't know if it was work

13  related or because they were calling me about another threat

14  against me from Juan.

15          Every day I go to work knowing that my bosses and my

16  coworkers know personal and private things about my life, and

17  have seen images that I didn't invite them into.  This

18  humiliation cannot be undone.

19          What I was experiencing was intimate partner violence,

20  at work and in my personal life.  It is petrifying because the

21  person you love becomes the person you fear.  I had no respite

22  from his torment.  Every single day Juan texted, called and

23  e-mailed me relentlessly.  Sometimes he would pose as a friend

24  or a family member of his, like his mom or an imaginary best

25  friend, claiming Juan loved me and Juan never meant me harm.

HCK8THOS

1    Sometimes he would pose as a person trying to extort me and

2    demand payment or else naked pictures and videos of me would be

3    posted all over the Internet.  Sometimes he would pose as

4    strangers, threatening to end my life.  And sometimes he would

5    call as himself claiming he had been framed.  And when I didn't

6    respond, his cycle would start again -- apology, extortion,

7    threat, denial.

8         I could not think about anything else.  I felt like a

9    shell of a person, watching myself shrink deeper into the

10   psychological torture I was experiencing.

11        When he didn't get a response from me, he took to any

12   media outlet he could get to listen and defame me publicly.  He

13   even went as far as faking his own near death.  He e-mailed

14   news outlets inflammatory fake stories about me.  He made

15   Tumblr pages about me and any man I had dated, complete with

16   pictures and references to STIs.  He filmed videos on YouTube

17   about me, and then posted videos of himself commenting on the

18   grotesque stories he had developed.  He did these things as

19   himself, as fake personas he invented, complete with pictures

20   and profiles, and as people he impersonated.  Technology gave

21   him an omnipresence over my life.  Beyond phone calls, e-mails

22   and texts, he used every digital platform imaginable to harass

23   me -- Twitter, Facebook, Instagram, OkCupid, Tumblr, YouTube,

24   Venmo, and Google.  Every time my phone buzzed, I panicked.

25        When I thought it couldn't get worse, he doxed me on

1    8chan, a Web site known for hosting child pornography and where

2    men promote violence against women, including rape and murder.

3    He posted my picture, home and work addresses and phone

4    numbers, urging the Web site users to target me.  He

5    crowd-sourced his attacks on me.  I felt like the walls were

6    closing in.  Everywhere I turned, Juan was there, waiting to

7    destroy my life, my career, my relationships, and probably kill

8    me.

9         While coping with the fear and trauma that I was

10   personally dealing with on a daily basis, I received calls,

11   texts and e-mails from my family and friends who Juan had also

12   targeted with his methods.  I was left to worry about how I

13   could manage going to work every day, while also dealing with

14   the reality of my life.  Also, while managing the fact that

15   Juan's terror was spreading to so many people around me, and at

16   times their workplaces and their extended families.  That I

17   know of, Juan went after at least 47 people in my life.

18   Sometimes it was someone as close to me as my 92-year-old

19   grandmother, calling me afraid for her safety and mine.  Or my

20   mother, receiving e-mails of a photo of my face, with a gun

21   sight target superimposed in it demanding payment.  People

22   distantly linked to me were receiving e-mails about me from

23   Juan or someone that Juan was impersonating.  He stalked other

24   people as me, and to this day I will never know how many people

25   he did that with.  Each time I learned Juan had abused someone

HCK8THOS

else, I was triggered and reminded of my own trauma and was

worried about their safety as well as my own.  Based on the

escalation of e-mail threats I had been receiving, I was

constantly fearful that my family, my friends, my employer, and

my clients were in as much danger as I was.

He tried to take away from everything and everyone

that was important to me.  Separation and isolation are central

aspects of intimate partner violence and acted as the

foundation for Juan's campaign.  Most people didn't understand

what I was going through and distanced themselves from me;

others were becoming victims and getting fatigued by the

vicarious, secondary and direct trauma themselves.  Sympathetic

loved ones would continually ask me, Why hasn't he been

arrested yet?, not understanding that these obvious crimes were

not being legally distinguished as domestic violence.  Everyone

watched as Juan's abuse escalated and my life grew more

terrifying.

The reality is that I asked for help from law

enforcement over 20 times.  I asked for restraining orders to

stop him.  I was told by the police, verbatim, "It will get

worse and then we can try to help."  Because he was using the

Internet as his method of violence, the police did not

recognize the severity of harm.  They couldn't or wouldn't do

the investigative work because Juan was masking his identity

through anonymizing e-mail accounts, VPNS, and the TOR browser,

HCK8THOS

1    making his threats, in their minds, untraceable.  I watched him

2    escalate every day.  Yet the police were very responsive to

3    Juan, believing his false accusations when they came to

4    investigate me, and not him.

5            Five months before Juan's arrest, he sent a threat to

6    a Brooklyn police station, stating I was planning to quote

7    "shoot up" the precinct.  The NYPD intelligence division

8    tracked me down in the middle of my workday to assess the

9    validity of such a threat.  They left assured that I was not

10   the one who had made the threat, but they could not verify and

11   locate the person who had, despite me telling them that it was

12   undoubtedly Juan Thompson.  Two weeks later he e-mailed a news

13   station with a death threat against me and the chief of police.

14   This truly solidified my fear that Juan was trying to kill me.

15   Soon after, the NYPD firearms division showed up at my

16   apartment to investigate me for selling guns.  If the police

17   had believed that I was planning a violent attack on a New York

18   City police station with my arsenal of alleged guns, I could

19   have been seriously harmed, or worse.  I know that was Juan's

20   goal.  He was now using them as a weapon against me.

21           Each time I came into contact with the police, I was

22   fearful of what would happen, due to Juan's continued

23   escalation of violence framing me to law enforcement agencies.

24   I felt paralyzed, hopeless and powerless, every moment of my

25   life.  Even so, I had no other recourse and I continued to ask

HCK8THOS

1  them for help; each time I told the officers that I knew my

2  abuser's name and I believed it was going to get worse.  When

3  the FBI showed up at my apartment because Juan had used my name

4  to threaten a Jewish community center in San Diego, I was

5  petrified and enraged.  I handed the FBI a 31-page timeline

6  chronicling each threat Juan had made against me and all the

7  people in my life.  The FBI said to me, he's escalating.  I had

8  been experiencing this level of abuse for nine months.  Four

9  days later, Juan was arrested for making eight threats against

10  Jewish community centers, while pretending to be me.  I have

11  learned from the media that it was actually 12 centers.

12          Juan devoted over an entire year to destroying my

13  life.  He painted me as an anti-Semite, a racist, a drunk, a

14  slut, a drug dealer, a child pornographer, and a gun runner.

15  He did everything he could to instill terror in my life.

16  Computers, phones, and tablets all became an apparatus for his

17  abuse.  The police confiscated 25 electronic devices from Juan

18  when he was arrested.  I will never know the full extent of his

19  harassment, the content he disseminated, and whatever else he

20  may have done in my name.  I do know that as a result of him

21  pretending to be me and stalking others, he has ended

22  marriages, targeted families, damaged relationships, threatened

23  the police, and engaged in domestic terrorism against Jewish

24  communities nationwide.  He struck fear into the heart of the

25  Jewish community in his vendetta against me.  These hoax

1    threats were not victimless pranks -- they altered the course

2    of hundreds of people's lives, and we still don't know if Juan

3    wouldn't have carried out his threats.

4            The abuse and victimization that I was subjected to is

5    not unusual.  Intimate partner violence needs more legal

6    attention, given that 93 percent of female homicides are

7    committed by a man the victim knows.  We know that in the past

8    year, each man who has committed domestic terrorism has a

9    history of domestic violence.  These charges of cyberstalking

10   and hoax threats Juan pled guilty to are inextricably linked.

11   If the police had recognized the stalking and abuse as domestic

12   violence when I had reported it, many times, hundreds of

13   people's lives would be different.

14           Today I speak to you as Francesca Rossi, not

15   "Victim-1."  There is no way here I can articulate the pain I

16   felt daily as Juan threatened my entire existence.  I am here

17   because I have the resources and strong support, but the

18   long-range effects of this trauma are undeniable.  Part of me

19   thinks that Juan is probably taking pleasure in hearing the

20   pain he caused me right now.  He always had a voyeuristic

21   enjoyment in my suffering.  Why else would he have anonymously

22   terrorized me while we slept in the same bed?  I am here

23   because I need everyone to know the destruction that Juan is

24   capable of, and that digital technology should be recognized as

25   a powerful weapon to inflict violence.  Countless people are

HCK8THOS

1  subjected to the same type and degree of stalking and abuse

2  that Juan inflicted on me, and worse.

3          This is not an Internet crime.  Technology may have

4  facilitated it, but all of this occurred in real life.  The

5  police diminished my abuse because my life-threatening attacks

6  came from phones and computers.  This is what domestic violence

7  looks like now.

8          My abuse was not legitimized until an entire

9  community, and the country was terrorized.  Juan used modern

10  technology to exploit antiquated laws.  However, we can prevent

11  this from happening to other women.  Let my story shape the way

12  we recognize the modern behaviors of attack and the weapons

13  that are used.  Let us believe women when they tell us of their

14  abuse, because the men that inflict it only get worse.  I urge

15  you to not let there be a next time, don't let Juan do this to

16  another woman, another community, or the country.

17          Juan's pathology and misogyny will still exist when he

18  comes out.  Each time we see an act of domestic terrorism, we

19  root it back to violence against women.  Every time.  And I

20  don't trust he won't do this again.  I know there are other

21  Juans out there doing this to other women right now.  We have

22  the power to stop them, starting right now, by holding Juan

23  Thompson fully accountable for his crimes.

24          Thank you so much for letting me speak.

25          THE COURT:  Thank you, Ms. Rossi.

HCK8THOS

1          This is the Court's statement of reasons for what I

2     will describe as my proposed sentence in this case.

3          In sentencing the defendant, I have considered all of

4     the materials referenced at the outset.  I have considered all

5     of the arguments that the defendant raised in his written

6     submissions and, of course, orally today.  I have considered

7     the exceptionally thoughtful statements that have been made in

8     this courtroom today by defense counsel and the prosecution,

9     and perhaps one of the most eloquent presentations I have heard

10    in this courtroom from Ms. Rossi.

11         I have considered each of the factors under Section

12    3553(a).  I need not recount all that I have considered, but I

13    have considered each of the factors.  I will comment on some of

14    it.

15         There are two crimes to which Juan Thompson has pled

16    guilty.  One is a charge of cyberstalking, which arises from

17    circulating false and threatening information about Ms. Rossi

18    over the Internet, causing substantial emotional distress, and

19    this was from July 2016 to March 2017.  But then there is Count

20    Two, a separate charge.  And that is, from January 2017 through

21    March 2017, Mr. Thompson conveyed at least 12 threats in either

22    his own name or in the victim's name, Ms. Rossi's name, to bomb

23    or commit acts of violence against Jewish community centers,

24    schools or organizations that provide services to and on behalf

25    of the Jewish community.  Each of these crimes in their own

HCK8THOS

1    right is extremely serious.

2           Because of the presentations that have been made

3    today, I had planned to go through the facts set forth in the

4    presentence report.  I do not believe I could do them justice

5    to any extent greater than what was heard from Ms. Rossi today.

6    Suffice it to say that some of the comments that were made and

7    some of the threats in an e-mail to a Jewish school, in

8    Farmington Hills, Michigan, the claim in the message was that

9    he was eager for a Jewish Newtown, a reference obviously to the

10   horrific shooting in Newtown, Connecticut in December 2012, in

11   which 20 victims were murdered.

12          Some of his threats to Jewish organizations were made

13   and required deviation of resources.

14          So on February 21, he sent an e-mail to the Council on

15   America-Islamic Relations, claiming that Ms. Rossi had placed a

16   bomb inside a Jewish center in Dallas, Texas.  He also sent an

17   e-mail to the Anti-Defamation League, which claimed that Ms.

18   Rossi had made bomb threats against Jewish community center

19   sites, and that she was planning on making more bomb threats.

20   The following day, the Anti-Defamation League received an

21   anonymous call, which claimed that explosive materials had been

22   planted in their office and were to be detonated within the

23   next hour.  Emergency services were immediately contacted after

24   the telephone call.

25          This is domestic terrorism.  It's domestic terrorism

in the literal sense, in that Mr. Thompson's actions were
designed to create substantial fear and distress in Ms. Rossi;
and, also separately, because he was motivated by the desire to
injure Ms. Rossi, they created terror and fear in the minds of
persons working at these various Jewish community centers.

The thing to be remembered is, as a judge presiding in
sentencings, I have people who have engaged in a crime which
was the exercise of bad judgment at a particular point in their
lives.  That's not what we are dealing with here.  There was no
error in judgment.  This was a sustained campaign against Ms.
Rossi, which terrorized her and caused terror on the part of
the people working for the institutions.  Mr. Thompson is
intelligent, well-educated, and he knew and appreciated the
nature and consequences of his acts and why they were wrong.

Now, I have considered all of the letters that have
been submitted, all of the submissions that have been made;
particularly, there is one from Mr. Thompson's younger sister
and several from folks who knew him at Vassar.

I have also considered Dr. Fernandez's report.  He
says that, based on the information provided in the evaluation,
Mr. Thompson does not meet criteria for a severe mental
illness.  But he goes on to say, "It's important to note that
he has endorsed" -- he, Mr. Thompson -- "has endorsed
experiencing symptoms consistent with depression and anxiety."
And, of course, Dr. Fernandez notes his severe alcohol abuse.

1    And he wonders if there is a possibility that he has a

2    personality disorder, but doesn't have enough information to

3    render a diagnosis.

4            I note that Dr. Fernandez says what Mr. Gombiner says,

5    and I think Mr. Thompson says as well, that he has a desire to

6    change and an intent to change, and I accept that at face

7    value.

8            Mr. Thompson did not grow up in easy circumstances.

9    He reports that his mother was a crack cocaine abuser, that his

10   father died after what appeared to be a car chase with police,

11   and that he was not really a positive force in Mr. Thompson's

12   life.  But Mr. Thompson's intelligence gave him the ability to

13   obtain a degree in political science, bachelor's degree, from

14   Vassar University in 2013.  It really was his intelligence and

15   creativity that made him such a horror to the people whose

16   lives he terrorized.  He used the gifts he had, he used the

17   education he had, as weaponry against other people.  He used

18   his knowledge of social media and computers and a creative

19   imagination to come up with some of the things that he came up

20   with, including accusing Ms. Rossi of watching child

21   pornography and various sexually transmitted diseases and the

22   like.  This required a lot of thought over a long period of

23   time.  This was no mistake.

24           Now, I have considered the need for just punishment.

25   This case cries out for Mr. Thompson to be punished; that is

HCK8THOS

1     the just thing to have happen here.  There is the need to

2     specifically deter him to protect the public from further

3     crimes of this defendant.  For the moment there is, in my view,

4     the risk that he would reoffend over the short-term.  I hope

5     that with a period of incarceration that may diminish.  I don't

6     know.  I don't have a crystal ball.  But I am certainly

7     positive that there is a need here, a strong need, to deter

8     others from engaging in conduct of this nature.

9            I have considered the sentencing guidelines, policy

10    statements and official commentary of the United States

11    Sentencing Commission.  I realize that I am not obligated to

12    sentence within the guidelines and that I have variance

13    discretion.

14           With regard to that variance discretion, the United

15    States Sentencing Commission was kind enough to give me some

16    statistics, I think it was about 18 months ago, about my own

17    sentencing practices, and it seemed that in noncooperation

18    situations, at the request of the defense, sometimes not

19    objected to by the government, I gave below guideline sentences

20    in about 28 percent of the cases that were before me.  I rarely

21    give sentences above the advisory guidelines, and the reason

22    this is true is because the guidelines help me ensure that

23    there are not unwarranted disparities among persons who are

24    convicted of crimes of this type.

25           I am not a judge who takes the guidelines lightly.  I

HCK8THOS

think they reflect a lot of wisdom.  But here, the level of intent, the level of intensity, the maliciousness behind it, the fact that this man was well-educated and he took his intellectual abilities and his education and used them to not just torment Ms. Rossi, but to spread this terror to 12 institutions, warrants a sentence of 60 months' imprisonment, three years' supervised release, waiver of the fine, based on limited earning ability and limited assets, restitution in an amount to be determined within the next 90 days, and a special assessment of $200.

It is my sincere view that the foregoing is sufficient but not greater than necessary to achieve the purposes of Section 3553(a).

Does the defendant or his counsel have any objection to the Court's proposed sentence or the statement of reasons for that sentence?

I will hear you now, Mr. Gombiner.

MR. GOMBINER:  Other than already stated, we don't have any legal objection.

THE COURT:  Thank you.

Any objection on the part of the government?

MR. WARREN:  No, your Honor.

THE COURT:  Mr. Thompson, please stand and I will pronounce sentence.

Juan Thompson, it is the judgment of this Court that

HCK8THOS

1  you are hereby remanded to the custody of the United States

2  Bureau of Prisons to be imprisoned for 60 months, and that's to

3  run concurrently on Counts One and Two.  Following release from

4  imprisonment, you shall be placed on supervised release with

5  the following terms and conditions:

6        You shall not commit another federal, state or local

7  crime, nor unlawfully possess a controlled substance.

8        You must refrain from unlawful use of a controlled

9  substance.

10        You must submit to one drug test within 15 days of

11  release from imprisonment and at least two periodic drug tests

12  thereafter as determined by the court.

13        You must cooperate in the collection of DNA as

14  directed by probation.

15        You must comply with the standard conditions of

16  supervision 1 through 13.

17        You will participate in an outpatient treatment

18  program approved by probation, which program may include

19  testing to determine whether you have reverted to using drugs

20  or alcohol.  You must contribute to the costs of services

21  rendered based on your ability to pay and the availability of

22  third-party payments.  The Court authorizes the release of

23  available drug treatment evaluations and reports, including the

24  presentence investigation report, to the substance abuse

25  treatment provider.

HCK8THOS

1           You must participate in the computer Internet

2      monitoring program administered by the probation office.  You

3      must provide the probation office advance notice of any

4      computers, automated services or connected devices that will be

5      used during the term of supervision and that can access the

6      Internet.  Probation is authorized to install any application,

7      as necessary, to survey all activity on computers or connected

8      devices owned or operated by you.  You may be required to pay

9      the cost of monitoring services at the monthly rate provided by

10     probation.  The rate and payment schedule are subject to

11     periodic adjustments.  Probation shall be notified by

12     electronic transmission of impermissible suspicious activity or

13     communications occurring on such computer or connected device

14     consistent with the computer monitoring policy in effect.

15          As triggered by impermissible or suspicious activity,

16     you must consent to and cooperate with unannounced examinations

17     of any computer equipment owned or used by you.  This

18     examination shall include, but is not limited to, retrieval and

19     copying of all data from the computer's connected devices,

20     storage media, and any internal or external peripherals, and

21     may involve removal of such equipment for the purpose of

22     conducting a more thorough inspection.

23          You must participate in an outpatient mental health

24     treatment program approved by probation.  You must continue to

25     take any prescribed medications unless otherwise instructed by

HCK8THOS

1   the health care provider.  You must contribute to the costs of

2   services rendered, based on your ability to pay and ability of

3   third-party payments.  The Court authorizes the release of

4   available psychological and psychiatric evaluations and

5   reports, including the PSR, to the health care provider.

6         You must submit your person, residence, place of

7   business, vehicle, and any property, computers, electronic

8   devices, electronic communication devices, and/or other media

9   under your control to a search on the basis that the probation

10  officer has reasonable suspicion that contraband or evidence of

11  a violation of the conditions of your release may be found.

12  This search must be conducted at a reasonable time and in a

13  reasonable manner.  Failure to submit may be grounds for

14  revocation.  You shall inform any other residents that the

15  premises may be subject to search pursuant to the condition.

16        You must not have contact with the victims in this

17  case, including, specifically, Ms. Rossi or any member of her

18  family or coworkers.  This includes any physical, visual,

19  written, or telephonic contact with such persons.

20  Additionally, you must not directly cause or encourage anyone

21  else to have such contact with the foregoing victims.  This

22  applies to all victims in this case, including the various

23  Jewish community centers and other organizations who are

24  victims, the employers who are victims, friends and associates

25  of Ms. Rossi who are victims, Ms. Rossi and her family and her

HCK8THOS

1    employers who are victims.

2              It is further ordered that you shall pay to the United

3    States a special assessment of $200, which shall be due

4    immediately.

5              There will be restitution in a separate order within

6    90 days, and the terms of payment will be set forth in that

7    proposed order.

8              I am going to require the government to submit that to

9    me by January 30.

10             MR. WARREN:  Understood, your Honor.

11             THE COURT:  OK.  As I said, based on limited assets,

12   limited earning ability, the fine is waived.

13             Mr. Thompson, you have the right to appeal the

14   sentence I have imposed on you.  If you cannot afford the cost

15   of an appeal, you may apply for leave to appeal as a poor

16   person.  The time limits for filing a notice of appeal are

17   brief and they are strictly enforced.  If you request, the

18   clerk of court will prepare and file a notice of appeal on your

19   behalf immediately.

20             Do you understand all that?

21             THE DEFENDANT:  Yes.  I make that request of the clerk

22   of the court.

23             THE COURT:  We will cause a notice of appeal to be

24   filed on your behalf.

25             Mr. Gombiner, can you undertake the filing of the

HCK8THOS

1    notice of appeal?

2            MR. GOMBINER:  Judge, yes, we will do that.

3            THE COURT:  So Mr. Gombiner is going to file the

4    notice of appeal on your behalf.  Is that all right, Mr.

5    Thompson?

6            THE DEFENDANT:  I have no choice.  So, yes, it's all

7    right.

8            THE COURT:  I have a request from a member of the

9    press.  "I am writing to request access to any sentencing

10   memoranda or other materials submitted, either by the

11   prosecution or defense, including letters relating to Mr.

12   Thompson's scheduled sentencing on December 20."

13           Any objection from the government?

14           MR. WARREN:  Your Honor, we would just ask to have the

15   opportunity to make redactions.

16           THE COURT:  On what?  How about the text of your

17   letter?  Let's start there.  Is there anything in the text of

18   the letter as distinguished from the exhibits?

19           MR. WARREN:  Yes, your Honor.

20           THE COURT:  Where?  Show me.

21           MR. GOMBINER:  Can we approach on this?

22           THE COURT:  No.  Because I am going to ask you, Mr.

23   Gombiner.

24           So go ahead.  Tell me where.

25           MR. WARREN:  Yes, your Honor.  On page 11, your Honor.

HCK8THOS

1          THE COURT:  Go ahead.  Tell me where.

2          Oh, I see.  Yes.  That relates to the matter that was

3    addressed at the sidebar.  This would be the third and fourth

4    sentence of the first paragraph on page 11.  Is that correct?

5          MR. WARREN:  That's correct, your Honor.

6          THE COURT:  You have permission to redact that.  I am

7    going to direct you to file the text of the letter by 3 p.m.

8    today with those redactions.

9          Is there anything in the exhibits that you want to

10   redact?

11         MR. WARREN:  Your Honor, on the police report, just

12   the opportunity to redact the officer's personal information.

13   That comes to mind right away.

14         THE COURT:  Granted.

15         Mr. Gombiner, anything that you wish to redact in your

16   sentencing submission?

17         MR. GOMBINER:  Yes, Judge.  At page 7, going on to

18   page 8.

19         THE COURT:  Just one second.

20         Yes, you can redact that paragraph at the bottom of

21   page 7 on to page 8.  Otherwise this should be filed on ECF by

22   3 p.m. today.

23         MR. GOMBINER:  Judge, also, can we redact the

24   psychological evaluation?

25         THE COURT:  Yes, you can redact that as well.

HCK8THOS

```
 1              Anything else from the government?

 2              MR. WARREN:  No.  Thank you, your Honor.

 3              THE COURT:  Anything else from the defendant?

 4              MR. GOMBINER:  No, Judge.  Thank you.

 5              THE COURT:  Thank you all very much.

 6                              oOo
```